IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIE BOLTON,

      Petitioner,                      No. CIV S-05-1991 JKS CHS P

   vs.

D.L. RUMNELS, et al.,

      Respondents.                 FINDINGS AND RECOMMENDATIONS

_____/

      Petitioner, a state prisoner proceeding pro se, brings this application for writ of habeas corpus pursuant to 28 U.S.C. §2254. Petitioner is serving a sentence of 37 years to life, plus a life sentence with eligibility for parole after 60 years, pursuant to a judgment of the California Superior Court, Sacramento County, Case Number 97F01537. Petitioner was convicted of two counts of unlawful sexual intercourse with a person incapable of consenting because of a mental disorder, four counts of committing a lewd act with force upon a child under the age of fourteen, and of committing the offenses against two or more victims. The sentence included an enhancement for one prior conviction of a violent or serious felony. After this court's January 3, 2008 order granting respondent's motion to dismiss, petitioner's sole surviving claim is ineffective assistance of counsel at trial. After careful review of the record, it is recommended that the claim be denied.

FACTUAL BACKGROUND

The following factual summary is taken from the unpublished opinion of the California Court of Appeal, Third Appellate District, Case No. C041230[1]:

**The Prosecution**

Apparently to the women in his life, defendant is an intoxicant. He beats them, betrays them, and molests their daughters. Yet, they return to him time and time again. The story begins with Celestine.

Defendant began dating Celestine in 1978. At the time they began their relationship, Celestine had a baby daughter, A.B. Over the years, defendant and Celestine separated and reconciled several times. In 1980 they had a daughter together.

A.B. testified that defendant began molesting her when she was eight years old. The molestations increased in frequency and force for about a year. Defendant forced her to kiss his penis and ultimately attempted to insert his penis into her vagina. He ejaculated on her and instructed her to clean up in the adjacent bathroom. When she was nine, she told her mother, who reported the molestations to the police. Defendant was arrested and jailed for six months. The prosecution introduced evidence of the police reports and the medical examinations that corroborated A.B.'s testimony.

During the time defendant was involved with Celestine, he also began a relationship with Albertina. In 1987 Albertina had a daughter, F.R. Within a year of F.R.'s birth, Albertina and defendant began living together sporadically. They, too, had a daughter together.

In 1990 or 1991 Celestine and her three children moved back in with defendant. The pattern repeated itself. Defendant again molested A.B., who was then 12 or 13 years old. A.B. reported the molestation to her mother.

Albertina married defendant in 1990, shortly after he was convicted of abusing her. In 1991 she called the police and reported that defendant had molested F.R., who was then four years old. In 1995 she called the police to report that defendant was smoking rock cocaine. The prosecution introduced evidence of many other reports of domestic violence and drug use. In 1997, for example, Albertina told police in a 911 call that defendant had kicked in the door, looking for jewelry to pawn to buy drugs, and had punched and kicked her in the head and body.

---

[1] C041230 opinion is lodged in this record as document 5 (1/18/07).

| | |
|---|---|
| 1 | Defendant worked for MV Transportation (MVT) from July 1993 to November 1996. MVT provided transportation for developmentally disabled students to the Elk Grove Adult Community Training program. Patty R. is developmentally disabled. Cognitively, she functions much like a six- to eight-year-old child. In 1993 defendant drove Patty on the bus to the program. The following year, he became a dispatcher and spent some of his time in Stockton. Nevertheless, dispatchers would sometimes drive the buses. |

Defendant worked for MV Transportation (MVT) from July 1993 to November 1996. MVT provided transportation for developmentally disabled students to the Elk Grove Adult Community Training program. Patty R. is developmentally disabled. Cognitively, she functions much like a six- to eight-year-old child. In 1993 defendant drove Patty on the bus to the program. The following year, he became a dispatcher and spent some of his time in Stockton. Nevertheless, dispatchers would sometimes drive the buses.

In the fall of 1996 Patty began to have nightmares two or three times a week for a couple of months. In January 1997 Patty became defiant, yelling and using profane language. She accused her mother of failing to "save" her. She shouted, "Willie raped me. My bus driver raped me."

Patty testified that defendant raped her in the back of the bus. She recounted that she was the first student to be picked up. Defendant ordered her to lie down in the back of the bus, where he pulled down her pants, put on a condom, and then inserted his penis into her vagina after she unsuccessfully tried to push him off. He put the used condom in a paper towel and discarded it by the railroad tracks. Patty testified that the rape occurred on May 10, 1995, the day one of her Shetland ponies was born. Another pony was born in May 1996.

Route sheets for May 1995 indicate there were several days when Patty was the first client picked up. An MVT division manager testified the morning route sheet for May 19, 1995, is missing from MVT's records. The regular driver that day, Irene Campa, was out; appellant was the dispatcher that day and would have driven the route if he had been unable to find a substitute. The route sheet for June 14, 1995, also is missing. MVT had no route sheets at all for the period from July 1995 through May 1996. On June 12, 1996, Patty had been the first passenger picked up, and appellant had been the driver; but he did not document the starting mileage on the route sheet, a violation of company policy.

On December 31, 1998, 11-year-old F.R. called 911 to report that defendant had raped her. She told the investigating officer defendant molested her on December 1, 4, 16, and 30. She provided few details about the first three incidents but was very specific about what occurred on December 30, the night before the interview.

She reported that defendant twisted her arm to make her lie on her stomach on the bed, then pulled off her jeans and underwear while she resisted and tried unsuccessfully to stick her fingernails in his arms. Defendant tried to stick his penis in her anus, but she crossed her legs so he could not penetrate her. He forcibly turned her and held her hands down, tried unsuccessfully to put his penis in her

vagina, then rubbed his penis on her stomach for about three minutes before turning her over and ejaculating on her back. DNA testing was later done on her underwear and jeans, which had been deposited in a laundry pile in the garage. Defendant was arrested. F.R.'s second interview was videotaped and played for the jury, during which she again recounts the details of how defendant molested her.

A forensic expert testified that defendant was the major contributor of the sperm found in the crotch area of F.R.'s panties. He was also a possible source of the semen found on her blue jeans.

Albertina filed for divorce in December 1999. In a signed declaration, she stated defendant beat her in front of their children. Yet she visited him in jail several times a week. During one visit, defendant told her, "'I'm sorry for what I did. I slipped. I was using cocaine and I was hallucinating. I thought she was you and as soon as I realized it wasn't you, I stopped and told her to leave.' " She remarried him in April 2000.

**The Defense**

Defendant testified in his own behalf. He denied molesting or raping anyone and portrayed himself as the victim of bizarre, jealous, and vengeful women. He asserted that Celestine, who believed in voodoo, engaged in such strange practices as collecting his semen and putting her menstrual blood in his food. He maintains that she saved the semen so she could frame him for the molestation of her daughter.

As for Albertina, he claims she is madly jealous and filed a series of false police reports anytime she suspected he was resuming his affair with Celestine. On one occasion, she went to his apartment, cut up his furniture and clothes, poured bleach on his couch, and cut the tires and scratched the paint on his car. He denied beating her or abusing her in front of their children.

Albertina and F.R. corroborated his testimony. Both denied the truth of all the earlier reports they had made. Albertina testified that she exaggerated the facts to have defendant removed from the house when she believed he was having an extramarital affair. F.R. testified she falsely accused him of molestation in the hope that her mother and father would be reunited and she could live with them in Southern California.

...The jurors heard considerable testimony about Patty's limitations as a percipient witness from her mother, her teacher, and two experts. The defense also offered compelling, though heartrending, evidence of others who had sexually abused Patty, including her brother "Willie," her neighbor, and another bus driver.  Patty's younger brother Willie had intercourse with her when she was

about 18 years old and he was 15. He was prosecuted in the juvenile justice system and the family engaged in years of counseling. As an adult, Willie lived in Alaska but spent time occasionally living with Patty and their mother.

Larry Cole, who at the time was in his early 40's, lived near Patty. She was 20 years old. He admitted he had been convicted of child molestation of a nine-year-old girl, and at the time of his arrest he told police she had "come on" to him. He testified that he was involved in a romantic relationship with Patty, and that although Patty's mother told him Patty was handicapped, she did not appear handicapped to him. He claimed Patty's mother gave him permission to have a sexual relationship with Patty, but she subsequently called the police when she learned she would lose Patty's social security disability income if Patty married Cole.

Another bus driver, Ernie Edwards, had sexual intercourse with Patty in the back of the bus and at her house. She referred to Ernie as her boyfriend and told her niece that she "kind of wanted" to have sex with him. Edwards and the defendant are both African American. Edwards was prosecuted and pled guilty to having sex with someone incapable of giving consent.

(C041230 opinion at 1-4.)

## STANDARD OF REVIEW FOR GRANTING RELIEF

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

/////

>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

The "contrary to" and "unreasonable application" clauses of §2254(d)(1) are different. Under the "contrary to" clause of §2254(d)(1), a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405. As the Third Circuit has explained, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3rd Cir. 1999) (en banc) (emphasis in original). The state court is not required to cite the specific controlling test or Supreme Court authority, so long as neither the reasoning nor the result of the state court decision contradict same. *Early v. Packer*, 537 U.S. 3, 8-9 (2002).

The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case. *Williams*, 529 U.S. at 410. The focus of this inquiry is whether the state court's application of clearly established federal law is objectively unreasonable. *Id*. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*.

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such

law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003). A court may deny a petition for writ of habeas corpus on the ground that relief is precluded by 28 U.S.C. §2254(d) without addressing the merits of the claim. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

## ANALYSIS OF THE CLAIM

The Sixth Amendment guarantees the effective assistance of counsel. A showing of ineffective assistance of counsel has two components. First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). After the acts or omissions that are alleged not to have been the result of reasonable professional judgment are identified, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689). In addition, there is a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

The second factor required for a showing of ineffective assistance of counsel is actual prejudice caused by the deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

Petitioner alleges that, during his lengthy trial, his attorney "became demonstrably ill and was unable to do his job." (Petition at 5.) Petitioner further states that he made several

*Marsden*[2] motions requesting substitution of counsel due to his attorney's illness. (Petition at 5.) Petitioner does not, however, identify any specific errors or omissions allegedly made by his attorney which would support an ineffective assistance of counsel claim. Petitioner's claim that counsel was unable to perform his job due to illness is vague and conclusory, and could be rejected on this basis alone. *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (*quoting James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief'"); *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th cir. 1970) ("[a]llegations of fact, rather than conclusions, are required").

In any event, the decision of the California Court of Appeal rejecting petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. In his direct appeal, petitioner did not dispute that his attorney worked closely with him for over two years and prepared diligently for trial. (C041230 opinion at 9.) The trouble did not begin until counsel became ill[3] on the second day of trial and proceedings were continued for five days. (C041230 opinion at 9.) At some point after returning, counsel indicated he was not getting enough sleep and was ordered to inform the court if he could not go forward. (C041230 opinion at 9-10.) On the 28th day of trial, counsel requested an early recess because of his difficulty sleeping and his recognition that he had "hit the wall." (C041230 opinion at 10.) The following day, counsel required another continuance because he was "shaking" in bed; his doctor subsequently recommended that he take an entire week off because of exhaustion. (C041230 opinion at 10.)

The fact that counsel's illness caused delays or continuances during trial does not demonstrate that his performance fell below an objective standard of reasonableness or that

---

[2] *People v. Marsden*, 2 Cal.3d 118 (1970).

[3] The record is vague about the specific nature of counsel's illness.

8

petitioner suffered any prejudice. Because of counsel's illness, the trial court assured petitioner that it would honor requests for additional time and would watch counsel "like a hawk [to] make sure that he is at the top of his game." (C041230 opinion at 13.) The trial court allowed all requested continuances, cognizant that counsel had invested over two years in preparing the case, had provided excellent representation, and was likely to recover and be able to complete the trial. (C041230 opinion at 12.) The trial court believed that counsel had been "an aggressive and effective advocate on behalf of petitioner." (C041230 opinion at 14.) When denying one of petitioner's *Marsden* motions for substitution of counsel, the trial court stated:

> I want to look you in the eye and tell you something. This man has done a superb job for you during the course of this trial. He has provided you with excellent representation. I made a mistake in the [previous] *Marsden* motion when I heard it last week by not telling you that. I see attorneys all the time. This is a difficult, complex case both as to the facts and the law. His is on top of it and he did a sterling job for you up until Tuesday morning at 10:30 when he said, 'Judge, I can't do it anymore, I am pooped out.' And we shut it down.

(C041230 opinion at 13.)

        The California Court of Appeal, Third District, found that the trial court remained willing to adjust the trial schedule to accommodate counsel's need for breaks and petitioner's need for continuances to consult with counsel throughout the course of the trial. (C041230 opinion at 13.) Every reasonable effort was made to ensure that petitioner received competent representation. (C041230 opinion at 13.) The state appellate court examined the long list of complaints in petitioner's direct appeal about what counsel did or did not do during trial, and determined that petitioner received competent representation:

> [M]any of these complaints are either frivolous or involve questions of strategy and judgment. For example, defendant objects to various aspects of the opening statement wherein Castro acceded to the prosecution's objections. But there may have been legitimate strategic reasons for doing so. He agreed to delete a reference to Patty's aggressive episodes because he could introduce reports demonstrating her aggressiveness. The evidence, not the argument in opening statement, was significant. Similarly, Castro may have

9

been convinced that the evidence that Patty had sex with Ernie and considered him her "boyfriend" was more compelling than other unrelated sexual relations she may have had. And he eliminated a reference to Patty's aunt because he had not located her and sought to avoid an adverse admonition by the court to disregard a reference to the aunt if she did not testify.

Similarly, Castro introduced a series of pay stubs into evidence. Yet defendant complains he should have introduced more. The court explained that Castro successfully moved into evidence pay stubs that were relevant to the dates at issue and that he was "continually aggressive with regard to the dates."

Defendant insists Castro was not vigilant in policing the jury and reporting evidence of misconduct. He claims he informed Castro that jurors were reading the newspaper in spite of the court's admonition to avoid articles about defendant. But there is no evidence the jurors actually read any coverage of defendant's case, although the newspaper defendant observed them reading did in fact contain an article about him. The court acknowledged it would have been preferable for Castro to alert the court to the possible transgression. That is not to say, however, that the bare possibility a juror might have seen an article renders it reasonably probable the outcome of the deliberations would have been different had Castro informed the court. We conclude that to the extent Castro's failure suggests inadequacy, the lapse was not prejudicial. Nor was there credible evidence that one or two jurors spoke with alternate jurors about witness Cole's nervousness during his testimony.

Finally, defendant asserts Castro abandoned him by failing to file a motion for a new trial. The Attorney General concedes that no motion was filed. But again, we cannot find the requisite prejudice. Had he filed such a motion, Castro would have challenged the court's ruling allowing the prosecution to amend the complaint during trial and, perhaps, raised his own ineffectiveness. But both issues had been thoroughly litigated and the court ruled against defendant. There is nothing to suggest that the same judge would have ruled any differently in considering a motion for a new trial. Both issues are now before us in this appeal, and for the reasons that follow, neither have merit.

...[T]he [trial] court managed a difficult situation with utmost care and concern for defendant's right to adequate representation by monitoring Castro carefully, granting numerous continuances to accommodate his illness, and listening patiently to each of defendant's concerns. Defendant failed to establish either a fatal deterioration in his relationship with Castro or inadequate representation. The Constitution guarantees defendant competent representation, not a lawyer in perfect health. We agree with the trial court that defendant received competent representation.

(C041230 opinion at 8-9.)

This decision is not contrary to, or an unreasonable application of any Supreme Court precedent regarding a criminal defendant's right to effective assistance of counsel. Accordingly, petitioner's claim that he received ineffective assistance of counsel at trial must be denied.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: December 29, 2008

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE